# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

## CASE NUMBER: 15-60095-CR-BLOOM

**UNITED STATES OF AMERICA**

*Plaintiff*

**v.**

**DANTE HERAS and JANNIS LEBELLOT,**

*Defendants.*

_____

### DEFENDANT'S RESPONSE TO THE PRESENTENCE INVESTIGATION REPORT AND REQUEST FOR A SENTENCE NO GREATER THAN 30 MONTHS

The defendant, Jannis Almirantes Lebellot, by and through her undersigned counsel, and pursuant to U.S.S.G. § 6A1.2-3, p.s., Fed. R. Crim. P. 32 (d), (e)(2) and (f), and the Fifth Amendment to the United States Constitution, respectfully registers her Response to the Presentence Investigation Report (PSR) and Request for a Sentence no greater than 30 Months and as grounds therefore, states as follows:

### I. INTRODUCTION:

Pursuant to *U.S. v. Booker*, 543 U.S. 220 (2005), the federal sentencing process has adopted a three-step approach. (See Fed. R. Crim. P. 11(M), amended December 1, 2007**)**

**First**, the Court is to resolve any disputed guideline issues and determine the *advisory* guideline range.  The PSR has applied § 2D1.8, a base offense level 20, based on a marijuana equivalent of between 60 and 80 kilograms, and  2-level enhancements for a firearm and maintaining a premises for the purpose of manufacturing a grow house. However, it is the understanding of Counsel that both parties agreed the base offense level is 16, not 20, based on the number of marijuana plants agreed to in the Factual Proffer,  and Ms. Lebellot is entitled to a 3-level reduction for her complete and timely acceptance of responsibility.  Therefore, the total offense level should be 17, not 24, and as a first-time offender, the *advisory* guideline range should be 24 to 30 months. With that said, it is counsel's further understanding the US attorney concurs with the same. It has been stipulated by and between the parties that the US will advocate for a sentence of 30 months, with the clear understanding that the defendant may argue for a sentence at the low end of the guidelines, to wit, 24 months. The court will be the final arbiter.

**Second,** the Court is to consider if there are any factors that may warrant a departure from the *advisory* guideline range. "The application of the guidelines is not complete until the departures, if any, that are warranted are appropriately considered," *United States v. Jordi*, 418 F. 3d 1212, 1215 (11th Cir. 2005), to achieve the sentencing objectives set forth in 18 USC § 3553(a).  The parties have agreed to recommend a sentence within the guideline range; therefore, Ms. Lebellot, through counsel, will not offer any downward departures.

**Lastly,** the Court is to consider all of the sentencing factors of 18 USC § 3553(a) and impose a sentence which is "reasonable" and not greater than

necessary to achieve the sentencing objectives set forth in 18 USC § 3553(a).  As set forth more fully below, Ms. Lebellot, through counsel, will identify factors worthy of this Court's consideration in imposing a sentence at the lowest end of the guideline range, consistent with the agreement between the parties.

## II. OBJECTIONS TO THE PSR:

**1.**  As to **paragraph 29** of the PSR, we believe the base offense level is 16, not 20, based on the amount of controlled substance Ms. Lebellot is responsible for, consistent with  the signed Factual Proffer.  The search warrant executed at one residence  recovered 181 live marijuana plants and another 113 were found at the second residence.[1]  Based on the facts agreed to by the parties, the base offense level is 16, not 20, based on the number of plants and a marijuana equivalent of between 20 and 40 kilograms.

**2.**  As to **paragraphs 23 and 37** of the PSR, Ms. Lebellot's acceptance of responsibility statement has been forwarded to the probation office and we ask that these paragraphs be amended to include her statement and the 3-level downward adjustment agreed to by the parties in paragraph 7 of the written Plea Agreement. As the probation officer has received and acknowledged this acceptance, and that the same is proper, she will be supplementing her own report by Friday, November 13. Therefore, we do not see this as an issue that will be contested.

**3.**  Consistent with our objections and the understanding of the parties, **paragraph 35** of the PSR should reflect an adjusted offense level 20,

---

[1] See paragraphs 2 and 9 of Factual Proffer

**paragraph 38** should reflect a total offense level 17, **paragraph 96** should reflect a total offense level 17, criminal history category I, and an *advisory* guideline range of 24 to 30 months, and **paragraph 102** should reflect a fine range of $5,000 to $1,000,000.

    **4.** Any objections/clarifications to non-sentencing issues have been communicated directly with the probation officer.

### III.  SENTENCING SUBMISSION

### AND REQUEST FOR A SENTENCE OF LESS THAN 30 MONTHS:

Jannis Lebellot  has pled guilty to two counts of using and maintaining a place to manufacture a controlled substance (marijuana), in violation of 21 USC § 856(a)(1). We believe the advisory guideline range is 24 to 30 months and the parties have agreed to 30 months.  To that end, Jannis Lebellot  offers the following.

**Nature and Circumstances of Offense:**

Jannis Lebellot has signed both a written Plea Agreement and Factual Proffer, and she has no objections to either the Offense Conduct section or the sentencing guideline calculations presented in  the PSR.  She has admitted  she and her co-defendant, Dante Heras, grew marijuana at two Broward County, Florida residences, and search warrants executed in April 2015 resulted in the seizure of between 200 and 400 marijuana plants, related paraphernalia, approximately $50,000 in cash, and a handgun found in the kitchen cabinet of one of the residences.  Jannis Lebellot has now accepted responsibility, she has pled guilty, and she remains profoundly remorseful for involving herself in this offense.

**Jannis Lebellot's Personal and Family History:** Jannis Lebellot is a 45 year old native of South Florida.  She is the daughter of Michael Lebellot and Selena (nee Almirantes), the half-sister of Jay and Tamara Duncan, the step-sister of John and Kathy Duncan, and the mother of 24 year old Chanel Masses and 27 year old Joey Juan Gonzalez.  Jannis' father wrote the following to this Court, dated August 10, 2015.

> I was 18 years old when Jannis was born.  Her mother, Selina Almirantes, was 16.  Immediately, I began realizing there was a serious problem within her family and that turned out to be Selina's father, doctor Gregory Almirantes.  Dr. Gregory was a violent man who beat his wife Jannis Raye James Almirantes (after whom my daughter was named) as well as his three daughters, Selina, Janel and Greggie.....This violence had affected my then wife Selina to the point she too liked violence and looked for it in our relationship.  Because of this, I decided to separate from her.  Jannis was only a baby then.  She was brought up in that environment and it had to have taken its toll.  Today, Selina is a person with serious issues and does not and cannot get along with anyone on her family.

Jannis did not see her father again until she was 12 years old.  During those early years, her relationship with her mother was dysfunctional and she was often the target of her mother's verbal and physical abuse.  Her mother married John Duncan, a Hialeah police officer,  when she was three years old. Although Jannis had a good relationship with John, her relationship with her mother only deteriorated further when she and John had children of their own.[2]  At the age of 10, Jannis revealed to her mother she had been sexually abused by a family friend beginning when she was three.  Her mother only became angry with her.

During those years, Jannis often sought refuge at her grandmother's home. At times she lived with her mother and attended school in Hialeah and, at other times, she lived with her grandmother and attended school in South Miami. Jannis lost her safety net when on Christmas Day, 1982, Jannis' grandmother killed herself with a shotgun.  Jannis was then 12 years old.  When she was 17, John Duncan killed himself by carbon monoxide poisoning.  Jannis' mother, who had always worked as a waitress, stopped working after she received a financial settlement following her husband's death.

Jannis' mental health and her relationship with her mother deteriorated further after her grandmother's suicide.  Jannis, herself,  attempted suicide later that year and was hospitalized, followed by placement in a group home.  The following year, she tried again and was Baker Acted at Jackson Memorial Hospital

---

[2]  Jannis' stepbrother, John Duncan, wrote this Court on September 18, 2015 and relied the experiences she and jannis shared during their formative years with his father and her mother.  He also wrote about Jannis' later life experiences, her relationship with Chanel, and her gentleness and kindness as an adult.

for 30 days. There was a third attempt when she was 16 years old.  She was a chronic runaway who abused cocaine and was often on her own.

At 17,  Jannis began a relationship with Juan Gonzalez.  She left school  after she learned she was pregnant and  finally left her mother's home and moved in with Gonzalez.  She left the baby with Gonzalez shortly after the birth of her son, Joey,  and moved to Orlando and her great grandmother's home.  Jannis knew she was in no condition to care for a baby.

From ages 17 to 19, Jannis' great grandmother supported her while she was under psychiatric treatment and received anti-depressants.  At 19, she felt well enough to return to Miami.  She briefly reconciled with Joey's father and found work as an administrative assistant at Palmetto Medical Center.  However, within a year, she was back in Orlando, unemployed, and back in treatment and on anti-depressants.

Jannis again returned to Miami, began a relationship with Wilbur Masses, and found work at Burdines.  When she became pregnant with Chanel, Masses pled guilty in federal court and went to jail for five years.

Jannis met Juan Carlos Gomez in 1991.  She and Gomez were working for Eagle Instruments and Chanel was then four months old.  Jannis later became office manager at Source Technical Instruments and she and Gomez began living with each other in 1994. By 1997, Jannis went to work for Gomez' new business.

Jannis and Gomez married in Las Vegas in 2001.   Gomez' business grew successful and required he travel a great deal.  Jannis was often left alone at home, where she again battled chronic depression and thoughts of suicide.  She returned

to treatment and anti-depressants, amid a controlling and abusive husband who frequently threatened to have her Baker Acted. She did not leave the house for nine months in 2003. When Jannis and Gomez divorced in 2007, she received a financial settlement, but bad business decisions between 2007 and 2011 left her with little.

Jannis met her co-defendant, Dante Heras, in 2007 and she began to substitute anti-depressants with ecstasy and marijuana. The marijuana helped her cope with "manic" episodes and insomnia. She and Dante moved to Orlando in 2011 so Jannis could care for Chanel, who had fractured her back and sustained a spinal cord injury in a 4-wheeler accident. They later returned to South Florida and she and Dante began living at the Southwest Ranches house which is the subject of the offense in November 2013. Chanel recently underwent another surgical procedure and Jannis and Dante have separated.

**Jannis Lebellot's History of Mental Illness:** As stated above, Jannis has a long history of mental illness. She has been Baker Acted, she has attempted suicide on at least three occasions, and she has been on anti-depressants or self-medicated since she was 12 years old. Jannis will tell this Court she has always been on something "so she does not have to feel anything."

Designation of B.O.P. inmates is found in B.O.P. p.s.5100.08. Its designation center in Grand Prairie, Texas first determines an inmate's security level and then identifies the needs of the inmate, most importantly any medical and/or mental health needs. We believe Jannis' history of mental and emotional problems will impact her designation.

The B.O.P. has four mental health care levels available.  CARE 1-MH provides no mental health care for inmates.  CARE 2-MH provides routine mental health or crises-oriented out-patient care.  CARE 3-MH provides enhanced out-patient  or residential mental health care.  Finally, CARE 4-MH is for inpatient psychiatric care for those gravely disabled who cannot function in general population.  As such, we believe Jannis will be designated at or near  CARE Level 3, available at the Federal Medical Facility at Carswell, Texas, an exclusive women's medical facility.[3]  Such a designation will take her far away from her family and friends.

> The Bureau of Prisons encourages visiting by family, friends, and community groups to maintain the morale of the inmate and to develop closer relationships between the inmate and family members or others in the community"  (see BOP p.s. 5267.07).

In sum, we believe the presence of a firearm in this offense will preclude Jannis' designation to a minimal security camp and her mental/emotional health history will require she be designated to a medical facility far from her loved ones.[4] Visits from "family members and others in the community" will be few and far between. We would ask the court to advise the appropriate executive authorities and Bureau of Prisons to consider the situation of Ms. Lebellot, given the factual

---

[3] See B.O.P. p.s.  51008.08 and The Champion, July 2015, <u>Securing a Favorable Federal Prison Placement.</u>

[4]  Co-defendant Dante Heras admitted during the search that the firearm seized at the house belonged to him.  He actually possessed the firearm before he and Jannis began their relationship in 2007.

reality that Mr. Heras has accepted ownership and responsibility for the weapon, admitting it was his and his alone, as noted in footnote 4, below.

**Latest Sentencing Statistics: The** United States Sentencing Commission's "Sourcebook" of Federal Sentencing Statistics for fiscal year 2014 provides statistics for 75,836 cases sentenced that year.  Specifically, as to 2,199  cases sentenced in the Southern District of Florida last year, 45.9 %, up from 37.5  % a year earlier,  received sentences below the *advisory* guideline range; 8.6 % because of substantial assistance motions, and 26.1 %, almost three times the number of Government sponsored motions, because of the sentencing factors of 18 USC § 3553.  Nationally, the nature and circumstances of the offense and/or history and characteristics of the defendant were cited as reasons for a downward variance in 10,352 cases. Indeed, district courts continue to exercise discretion, post-*Booker*, and impose sentences below the *advisory* guideline range.

## Summary of Critical Factors Warranting a Sentence
## at the Low End of the Guidelines;

Counsel reservesd the right, negotiated with the US attorney, to ask for the low end of the guidelines that were stipulated to, back in August, to wit, 24 to 30 months. As stated, the US attorney, in complete candor, has suggested she will ask for the high end of the guidelines. Here are some factual reasons why Ms. Lebellot should be given a sentence at the lower range.

First, as noted, at paragraph 17 of her PSI, the probation officer acknowledges that the co-defendant Heras owned a gun found at the scene of the

crime in a closet, and that he alone purchased it, owned it, and had knowing possession of it. This is corroborated in his post Miranda statement. Nevertheless, at paragraph 30, the PSI, by implication, charges Ms. Lebellot with possession thereof, and adds on two offense level points, pursuant to 2D1.1(b) (1). The undersigned has stipulated to the proffer, and can't object to the enhancement, or materially object to the terms and conditions enumerated and consented to therein, but in stipulating with the prosecutor to allow us to argue the low end of the guidelines, we ask the court to recognize the factual truth that Ms. Lebellot was not the custodian of the gun, though found on scene at the time of the offense.

Yes, the statute requires she be charged, and yes, it is scored in against her, but since our plea agreement provides we can ask for a lower sentence, one just cause for the same is that the gun charge enhances Ms. Lebellot's penalty for conduct above and beyond the scope of her control. The defendant submits that the harsh guidelines of the statute should not be used to penalize a party where a court, as here, has the discretion to impose a sentence that is more consistent with the defendant's conduct.

Similarly, the defense, will, ore tenus, submit to this court a number of cases where United States district court judges have gone below guidelines based on the emerging reality that marijuana sentences in America are too harsh. Given that reality, judicial discretion in this instance affords this court an opportunity to adopt an emerging trend of lower sentences, but still remain lawful and proper within the plea agreement and the federal sentencing guidelines.

The irony is that the conduct, which is criminalized here, and leading to Ms. Lebellot's incarceration is now taxed and regulated in numerous states. One federal court even opined that grow houses can't be treated anymore as heinous offenses, but might be treated more like selling unlabeled cigarettes. We are not suggesting the same. The defendant committed a crime under the laws of Florida and the U.S. We are suggesting that the nature of the conduct is such that the court may evaluate and consider the modest adjustments being made across the nation, legislatively, at the polls, and in the White House, so as not to demonize this conduct with unduly harsh sentences.

The reality is that sentencing guidelines everywhere are being reviewed throughout the United States for undue harshness. Here, in a case like this, the court is given the opportunity to use its judicial discretion to recognize a discernible trend and thus impose within those parameters a more lenient result for the defendants.

**Conclusion:**   Jannis Almirantes Lebellot   is well aware that in fashioning a "reasonable" but not greater than necessary sentence in his case, this Court must consider the nature and circumstances of the offense, 18 USC § 3553(a)(1).  To that end, she has admitted she and Dante Heras were responsible for the marijuana grow houses identified in the Indictment and the PSR. She has accepted responsibility, she has expressed her profound remorse, and she has signed both a written Plea Agreement and Factual Proffer.  In doing so, she knows her guilty plea in this case will result in her incarceration for the first time in her life, and she will always be a convicted felon.

Finally, Jannis is also aware this Court must also consider her personal history, 18 USC § 3553(a)(1), in fashioning a reasonable but not greater than necessary sentence in her case.  The PSR and this filing certainly reveal Jannis has had a mostly unfortunate life.   She has battled mental illness and has been medicated most of her life.  This was true during her participation in the instant offense.   Pursuant to the terms of the written Plea Agreement, Jannis asks this Court to impose a term of incarceration which will not separate her from her loved ones any longer than is reasonably necessary.

Jannis Lebellot   and Counsel   thank this Court for considering our Response to the PSR, our Request for a Sentence of less than 30 Months, and the many letters written on Jannis' behalf, submitted to the court separately.   Counsel will have further remarks at the time of sentencing.

I HEREBY CERTIFY that on this 9th day of November, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following; Francis Viamontes, AUSA (Francis.Viamontes@usdoj.gov), 99 NE 4th Street, Miami, FL 33132.

Respectfully submitted,

**Norman Elliott Kent**
National Organization for Reform Marijuana Law (NORML)
709 SE 7th Street Suite 709
Fort Lauderdale, FL 33301
954-763-1900
Fax: 954-763-4792
Email: norm@normkent.com

By /s/ Norman Elliott Kent

Norman Elliott Kent
Florida Bar Number 271969